**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-2010**

CHRIS WHITE,

                   Plaintiff – Appellee,

          v.

EATON   CORPORATION   SHORT   TERM   DISABILITY   PLAN;   EATON
CORPORATION LONG TERM DISABILITY
PLAN,

                   Defendants – Appellants.

Appeal from the United States District Court for the District of
South Carolina, at Anderson.   Henry F. Floyd, District Judge.
(8:04-cv-01848-HFF)

Argued:  October 29, 2008          Decided:  January 21, 2009

Before WILLIAMS, Chief Judge, MICHAEL, Circuit Judge, and John
T. COPENHAVER,  JR.,  United  States  District  Judge  for  the
Southern District of West Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Anna K. Raske, BENESCH, FRIEDLANDER, COPLAN & ARONOFF,
L.L.P., Cleveland, Ohio, for Appellants.  Robert Edward Hoskins,
FOSTER  LAW  FIRM,  L.L.P.,  Greenville,  South  Carolina,  for
Appellee.  **ON BRIEF:** Jeffrey D. Zimon, BENESCH, FRIEDLANDER,
COPLAN & ARONOFF, L.L.P., Cleveland, Ohio, for Appellants.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This case involves the decision of Eaton Corporation ("Eaton") to terminate the short term disability ("STD") benefits of one of its former employees, Christopher White. White received STD benefits under the Eaton Corporation Short Term Disability Program (the "Plan") from June 27, 2003 through November 12, 2003, at which time Eaton determined that White was capable of returning to work as a machinist and terminated his benefits. After exhausting Eaton's internal appeals process, White brought suit in federal district court, arguing that Eaton abused its discretion in denying further STD benefits. The district court concluded that Eaton did abuse its discretion and that White was entitled to further STD benefits. We affirm.

I.

White began working for Eaton as a machinist on January 29, 2001. He began experiencing back pain in 2002 and underwent surgery to repair a herniated disk on August 23 of that year. Dr. Michael Kilburn performed the surgery, and by November of 2002 it appeared that White's back pain was no longer an issue. White's back pain resumed the following summer, however, and on June 26, 2003, he ceased his employment with Eaton. He then returned to Dr. Kilburn on July 8, 2003 and again on July 17,

3

2003. These visits resulted in Dr. Kilburn providing White with a lumbar epidural steroid injection and a work release.

On August 19, 2003, White visited Dr. Kilburn again, but this time White informed the doctor that he was in litigation with Eaton about a possible worker's compensation claim. Dr. Kilburn noted that White was "doing well" and "no longer [had] any appreciable pain in his left leg," but chose to refer him to another doctor, Dr. Kevin Kopera, because an appraisal of White's workplace duties was "outside the realm of [Kilburn's] expertise." (J.A. at 527.) Dr. Kopera evaluated White on September 9, 2003 and made the following observations:

> Mr. White was limited greatly in terms of flexion and extension at the waist and both of these movements tended to aggravate his low back pain. Lateral bending in each direction appeared to be less restricted but also produced some amount of discomfort. . . . Mr. White did have some increased symptoms with the left straight leg raise test in a sitting position in terms of increased discomfort.

(J.A. at 592.) These observations led Dr. Kopera to conclude that White was suffering from "[c]hronic low back pain with lumbar degenerative disc disease and possible residual left sided lumbar radiculopathy." (J.A. at 592.) Concerning White's ability to work, Dr. Kopera observed that White "appear[ed] limited in his ability to bend and lift and seems to be limited at this point primarily to sedentary work activities." (J.A. at 592.) Ten days after the visit with Dr. Kopera, White visited

4

his primary care physician, Dr. Oliver Willard, who noted that a July 3, 2003 MRI of White's back showed "recurrent disc extrusions left & right of center at L5-S1" and a "[s]mall posterolateral disc protrusion L4-5." (J.A. at 594.)

On October 30, 2003, White performed a Functional Capacity Evaluation ("FCE") arranged by the Plan's Claims Administrator, Broadspire Services, Inc. ("Broadspire"). The purpose of the FCE was to establish "[White's] physical status, [as well as] restrictions and limitations" on his ability to return to work as a machinist. (J.A. at 532.) Importantly, the FCE concluded that White "did not demonstrate ability to meet the following job demand categories: Walk and Reach Immediate." (J.A. at 532.) Despite this observation, the FCE ultimately found that White's "[p]hysical abilities do match the job description of a machinist." (J.A. at 533.) It therefore concluded that White "demonstrated the ability to physically return without modifications." (J.A. at 533.)

Eaton denied White's claim for continued STD benefits on November 12, 2003, in reliance upon the conclusions of the FCE. White exercised his right to appeal this determination, asked for additional time to prepare his appeal and submitted additional evidence in support of his appeal. This additional evidence consisted of affidavits from White and Dr. Kopera, as well as medical records from Dr. Kopera, Dr. Willard, and

5

physicians at Piedmont Internal Medicine ("PIM"). White also submitted his MRI results from 2002 and 2003.

Dr. Kopera's and White's affidavits both described White's symptoms and concluded that he was unable to return to work. In particular, Dr. Kopera noted that White "suffers from a number of back problems including degenerative disc disease, left lumbar radiculopathy, and severe and chronic back pain." (J.A. at 569.) He concluded that White was "completely and totally disabled" based on White's "physical problems and the side effects of his prescription medications." (J.A. at 573.)

White also submitted his MRI from July 3, 2003, the report for which stated "[t]here is some degeneration of the L5-S1 disc as previously demonstrated with some chronic discovertebral changes in the endplates surrounding the L5-S1 disc." (J.A. at 604.) In addition, the report remarked that the "L4-5 demonstrates a very small left posterolateral disc protrusion with no nerve root impairment" and that the L5-S1 had "recurrent disc extrusions." (J.A. at 604.) There was also evidence of an "asymmetric left posterolateral disc bulge or broad-based disc protrusion at this level, which does not appear to impinge on the left L5 nerve root in the neutral foramen." (J.A. at 604.)

This information was forwarded to a Broadspire peer-reviewer, Dr. Michael Goldman, D.O., for further evaluation. Dr. Goldman, who did not examine White personally, concluded

6

that White "has no specific neuromuscular or musculoskeletal definitions that would contraindicate his returning to occupational activities." (J.A. at 612.) He summarized: "Therefore, based on my review of all of the medical records available to me, it is my opinion that the medical records as reviewed fail to support functional impairment that preclude the claimant from returning to his occupational activities from 11/12/03 to the present time." (J.A. at 612-13.)

By letter dated February 14, 2004, Broadspire informed White that it was upholding the original decision to deny continuation of his short-term disability benefits. The letter stated its conclusion as follows:

> While the affidavits of Dr. Kopera and your client state general complications of his medications preclude his return to work, there was insufficient objective, quantifiable medical evidence presented to substantiate this assertion. There were no specific neuromuscular, musculoskeletal or cognitive deficits confirmed that would preclude your client from performing his normal job duties.

(J.A. at 615.) This letter also informed White of his right to a final appeal within 180 days. White again requested additional time to appeal, but never filed additional medical evidence in support of his claim. On April 16, 2004, as part of the final appeal, Broadspire employed another peer reviewer, Dr. Robert Ennis, to examine all of White's medical documentation. Dr. Ennis concluded "the claimant's medical records do not

7

support a functional impairment that would prevent him from working between 11/13/03 and the present time." (J.A. at 623.)

Finally, Broadspire submitted White's file to the Medical Review Institute of America (MRIoA) for independent review. In its May 12, 2004 report, the MRIoA concluded that "[a] review of the records does not support the patient's claim of disability. He has continuing complaints of back pain, but multiple physical exams have shown limited objective findings. . . . Most importantly, the FCE – the best test of his functional abilities – demonstrates that he is capable of performing his regular work." (J.A. at 512.)

Eaton issued White a final determination letter on June 3, 2004, upholding Broadspire's denial of benefits for White effective November 13, 2003. The determination letter stated its conclusion as follows:

> The objective findings described in the medical records, functional capacity evaluation, peer reviews and the independent medical reviews do not support a finding of ongoing disability which would prevent Mr. White from performing the essential duties of his regular position as a machinist as of November 13, 2003. In addition, each medical reviewer of Mr. White's information concluded that the objective information did not support a finding that Mr. White was unable to perform the essential duties of his job. The functional capacity evaluation performed on October 30, 2003, specifically concluded that "physical abilities do match the job description of machinist."

8

(J.A. at 509.) White responded by filing a civil action, under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.A. § 1132(a)(1)(B) (West 1999), on June 10, 2004 in the United States District Court for the District of South Carolina. On September 4, 2007, the district court entered an opinion and order, granting summary judgment in favor of White. The district court determined that Eaton abused its discretion by relying on the FCE, which the district court claimed suffered from an "internal contradiction." (J.A. at 721.) The district court was also troubled by Eaton's treatment of White's MRI – it noted that "[d]efendants' rejection of the findings of the abnormalities observed above, without any explanation as to why they were doing so, was not the result of a deliberate and principled reasoning process." (J.A. at 724.) Consequently, the district court ordered Eaton to pay White STD benefits from November 13, 2003 onward. (J.A. at 705.)

II.

A.

We review a district court's decision to grant summary judgment de novo, and we employ the same legal standards applied by the district court. Elliot v. Sara Lee Corp., 190 F.3d 601, 605 (4th Cir. 1999). When, as in this case, an ERISA benefit plan vests discretionary authority to make benefits eligibility

9

determinations with the plan administrator, a reviewing court evaluates a denial of benefits under an abuse of discretion standard.[1] Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997). Under this standard, an administrator's decision "will not be disturbed if it is reasonable," even if we "would have come to a different conclusion independently." Id. To be reasonable, the decision must be "the result of a deliberate principled reasoning process" and be "supported by substantial evidence." Brogan v. Holland, 105 F.3d 158, 161 (4th Cir. 1997) (internal quotation marks omitted). This reasonableness inquiry is guided by eight non-exclusive factors:

(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.[2]

---

[1] The Plan provides: "The Plan Administrator shall have discretionary authority to determine eligibility for benefits and to construe any and all terms of the Plan, including, but not limited to, any disputed or doubtful terms." (J.A. at 496.)

[2] We note that a conflict of interest can no longer operate to reduce the deference given to a fiduciary's discretionary decision to deny benefits. See Champion v. Black & Decker (U.S.) Inc., No. 07-1991, slip op. at 8 (4th Cir. Dec. 19, 2008) (Continued)

10

Booth v. Walmart Stores, Inc., 201 F.3d 335, 342-43 (4th Cir. 2000). We turn now to the merits of Eaton's appeal.

B.

In Donovan v. Eaton Corp., 462 F.3d 321 (4th Cir. 2006), we affirmed a district court's grant of long-term disability benefits to another Eaton employee. In that case, as here, Eaton claimed that there was a lack of objective evidence of disability and denied benefits. Id. at 324-26. We found that decision unreasonable, however, because of Eaton's "wholesale disregard" of evidence supporting the employee's claim. Id. at 329. Specifically, Eaton focused on a statement by the employee's doctor that suggested she was still capable of performing sedentary activities, without addressing a subsequent statement by the same doctor in which the doctor determined that the employee was totally disabled. Id. We also observed that Eaton's in-house peer reviewers ignored evidence favorable to Donovan's claim, including Donovan's own statements regarding her pain levels and ability to engage in everyday activities. Id. at 327.

---

(addressing the impact of Metropolitan Life Ins. Co. v. Glenn, 128 S. Ct. 2343 (2008), on our standard of review when a conflict of interest exists). When there is a conflict of interest, we must apply the abuse of discretion standard and treat the conflict of interest as only one factor among the several that we examine in a reasonableness determination. Id.

11

We believe that this case is substantially similar to Donovan. In both cases, Eaton has either failed to elaborate on, or outright ignored, evidence favorable to the claimant. These deficiencies in the Plan's decision-making process are reflected especially in its treatment of White's FCE, its failure to address conflicting explanations of White's job requirements, and its failure to adequately address medical evidence supporting White's claims. We address each of these shortcomings below.

First, the Plan relied heavily on White's FCE in making its determination that White was capable of performing his job requirements. In the final determination letter provided to White, Eaton specifically referenced the FCE:

> The functional capacity evaluation performed on October 30, 2003 specifically concluded that "physical abilities do match the job description of a machinist. Therefore, the evaluee has demonstrated the ability to physically return without modifications." The conclusions of the functional capacity evaluation were based on the results of objective, physical tests.

(J.A. at 509.) The FCE's conclusion that White was capable of meeting the job description of a machinist does not comport with its actual observations of White's physical abilities. The FCE specifically concluded that White could not fulfill his job's walking requirements, and the FCE's subsequent determination that White could fulfill the requirements of his job is

12

irreconcilable with this observation.  The Plan made no mention of this fact in its final determination.

The Plan's failure to account for the internal inconsistencies in the FCE is especially problematic due to the reliance placed on the FCE by the medical reviewers who evaluated White's claim.  The in-house peer reviews by Dr. Goldman and Dr. Ennis both referenced the FCE's conclusions regarding White's ability to return to work.   In his review, Dr. Goldman remarked:

> The result of [the FCE] suggested that the claimant gave a reliable effort.  His functional abilities demonstrated that his abilities met specific job demands in the following categories:  High lift, mid lift, low lift, carry up to 20 pounds, push cart up to 40 pounds, pull cart up to 40 pounds and standing. . . . The conclusion was that his physical abilities did match the job description of a machinist; therefore the claimant had demonstrated the physical ability to return without modifications.[3]

(J.A. at 612.)   Dr. Ennis remarked that the FCE "indicate[d] that the claimant was able to perform work activities, which were consistent with his job description as a machinist . . ." (J.A. at 623.)   Finally, the opinion provided by the independent medical reviewer appears to have given the FCE great weight.  It explained:   "Most importantly, the FCE – the best test of his

_____

[3] We note that Dr. Goldman did not mention that the FCE demonstrated that White's abilities did not meet the specific job demands in the walking category.

13

functional abilities – demonstrates that he is capable of performing his regular work." (J.A. at 512.) None of these doctors noted the discrepancies in the FCE or suggested that such discrepancies were accounted for in how they incorporated the FCE into their ultimate conclusions. And, there is no indication that the Plan considered the reviewers' failure to account for the inconsistencies in the FCE when the Plan relied on the reviewers' conclusions in denying White's claim.

Second, Eaton's final determination also failed to address conflicting explanations of White's job requirements. White's FCE showed that White was capable of lifting one to ten pounds constantly, eleven to twenty-five pounds frequently, and twenty-one to fifty pounds occasionally. A worksheet completed by Eaton's human resources department stated that White's job required that he lift up to 100 pounds. But, on November 6, 2003 – less than one week after White's FCE limited his lifting ability to fifty pounds or less – Eaton's human resources department sent an e-mail clarifying that White "in reality" never lifted more than fifty pounds. (J.A. at 553.) The e-mail was sent by Susan Watts, the same Eaton employee who signed off on the original worksheet indicating that White did in fact have to lift more than fifty pounds. The final determination recites these different descriptions of White's lifting requirements,

14

but fails to acknowledge the clear inconsistency between the two.

The final determination also failed to even mention White's affidavit, which described his job duties. Specifically, White averred:

> As a machinist and production worker I was required to set up wheel changes on machine production runs. My job entailed was that I was required to lift the wheels which weighed up to 100 lbs. with a crane which meant I had to climb into the machine, hook the wheel up to the crane, and operate the crane to pull the wheels out. I was also required to climb up onto tables which were approximately four and a half (4 1/2) feet tall. I was also required to climb onto machines that were approximately five (5) feet tall in order to get into the machine to change the wheels. I was also required to run a machine which required that I load the feeder then once the parts move through the machine they were then placed in a bin at the end of the machine. I was then required to lift that bin and place the parts in a drier. Once the parts were dried I had to remove them from the drier and put them in a bin and move the parts to the next part of production. In that job I was required to lift from 50 to 100 lbs. and sometimes over 100 lbs.

(J.A. at 564-65.) The affidavit testimony and the human resources worksheet are consistent and clear: White did have to lift over 50 lbs. as part of his job. Yet, the final determination letter did not mention the affidavit or address its impact on the Plan's decision to credit the November 6 e-mail as the authoritative description of White's lifting duties. The Plan's failure to explain why it credited the November 6 e-mail instead of the original worksheet is a glaring omission

15

considering that, based on his FCE, White would be able to meet one of these sets of lifting requirements, but not the other.

Third, the Plan's final determination letter failed adequately to address medical evidence in White's favor. First, the final determination contained absolutely no discussion of the fact that White had undergone serious back surgery in 2002. Cf. Evans v. Eaton Corp., 514 F.3d 315, 323 (4th Cir. 2008) (no abuse of discretion in a case where Eaton's reports used a "measured tone, which acknowledges Evans's serious medical problems without a hint of dismissiveness"). It also credited the independent reviewer's opinion that White's MRI findings are "unimpressive," despite the fact that the MRI clearly evidenced abnormalities, including "degeneration," a "very small left posterolateral disc protrusion with no nerve root impingement" of the L4-5, and an "asymmetric left posterolateral disc bulge or broad-based disc protrusion" of the L5-S1. (J.A. at 604.) Finally, and significantly, the Plan discounted the affidavit of Dr. Kopera. It concluded that "the Affidavit . . . did not provide any objective findings of disability." (J.A. at 509.) Dr. Kopera's affidavit, however, included his diagnosis that White "suffers from a number of back problems including degenerative disc disease, left lumbar radiculopathy, and severe and chronic back pain." (J.A. at 569.) He also provided a rundown of White's numerous prescription drug medications.

16

Eaton's dismissal of Dr. Kopera's affidavit cannot be reconciled with the Plan's own medical information requirements. Medical diagnoses and medications are objective findings under the terms of the Plan.[4]

## C.

In sum, the Plan failed to address evidence favorable to White "thoughtfully and at length." Evans, 514 F.3d at 326. It relied on a fundamentally flawed FCE, based its determination on a description of White's lifting duties that was contradicted by evidence in the record and disregarded medical evidence favorable to White, even though the evidence met the Plan's own definition of "objective findings." Eaton's failure to seriously engage in a discussion of White's favorable evidence suggests that, as in Donovan, Eaton abused its discretion by denying White benefits. See Donovan, 462 F.3d at 329 (finding an abuse of discretion where there was a "wholesale disregard" of evidence in the claimant's favor); Glenn v. Metropolitan Life Ins. Co., 461 F.3d 660, 672 (6th Cir. 2006) (finding an abuse of discretion in a case where the administrator "offered no

---

[4] The plan lists the following as examples of objective findings: "physical examination findings (functional impairments/capacity); diagnostic test results/imaging studies; diagnosis; X-ray results; observation of anatomical, physiological or psychological abnormalities; and medications and/or treatment plan." (J.A. at 488.)

17

explanation for its resolution of [an inconsistency in the evidence] or, for that matter, whether it was given any consideration at all"), aff'd, 128 S. Ct. 2343 (2008).[5]

III.

For the above reasons, the district court's decision finding an abuse of discretion by Eaton and granting White benefits is hereby

AFFIRMED.

---

[5] We also note that the final Booth factor – the existence of a conflict of interest – weighs in White's favor because Eaton both funds and administers the Plan. See Booth v. Walmart Stores, Inc., 201 F.3d 335, 343 (4th Cir. 2000). "In such a circumstance, 'every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket'." Glenn, 128 S. Ct. at 2348 (quoting Bruch v. Firestone Tire & Rubber Co., 828 F.2d 134, 144 (3d Cir. 1987)). Thus, Eaton was operating under a conflict of interest when it denied White's benefits claim.

A conflict of interest "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an . . . administrator has a history of biased claims administration." Glenn, 128 S. Ct. at 2351. White argues that Eaton has shown a history of biased claims administration and that Eaton's conflict of interest should therefore weigh heavily in our balancing of the Booth factors. Because we do not consider Eaton's conflict of interest central to our conclusion that it abused its discretion in denying White's benefits, we decline to address how much importance to give the conflict in this case.

18