**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1854**

ROBERT SHUPE,

Plaintiff – Appellant,

v.

HARTFORD LIFE & ACCIDENT INSURANCE COMPANY; HYATT HOTELS
CORPORATION GROUP DISABILITY INCOME INSURANCE PLAN,

Defendants – Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria. Claude M. Hilton, Senior District Judge. (1:18-cv-00860-CMH-TCB)

Argued: October 29, 2021                          Decided: December 7, 2021

Before WILKINSON, AGEE, and FLOYD, Circuit Judges.

Affirmed in part, reversed in part, and remanded with instructions by published opinion.
Judge Agee wrote the opinion, in which Judge Wilkinson and Judge Floyd joined.

**ARGUED:** Glenn R. Kantor, KANTOR & KANTOR, LLP, Northridge, California, for
Appellant. Grace Robinson Murphy, MAYNARD COOPER & GALE, P.C., Birmingham,
Alabama, for Appellees. **ON BRIEF:** John C. Neiman, Jr., MAYNARD GOOPER &
GALE, P.C., Birmingham, Alabama, for Appellees.

AGEE, Circuit Judge:

Robert Shupe appeals from the district court's grant of summary judgment in favor of Hartford Life & Accident Insurance Company ("Hartford") and Hyatt Corporation Disability Plan (the "Plan") (collectively "Appellees"), which had terminated his long-term disability benefits. He also challenges the district court's grant of Appellees' motion to strike certain evidence. For the following reasons, we affirm in part, reverse in part, and remand to the district court with instructions to enter final judgment in Shupe's favor.

## I.

In 2003, Shupe was an Executive Sous Chef for the Hyatt Corporation in San Diego, California, when he began experiencing symptoms of osteomyelitis, an infection in his spinal cord. He was thirty-seven years old. After rounds of antibiotics and surgery, he was unable to maintain his employment and left his position in July 2004 due to pain from chronic osteomyelitis, degenerative disc disease in the lumbar spine, and spinal stenosis that was so severe that he could not stand for an extended period of time.

Shupe participated in the Plan, which was and is an ERISA[1] qualified plan. Hartford served as claims administrator and insurer. As relevant here, the Plan provided:

> *Disability*[2] means that during the *Elimination Period*[3] and the following 24 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:

---

[1] Employee Retirement Income Security Act of 1974.
[2] Italicized terms are those defined under the Plan.
[3] "The *Elimination Period* begins on the day *You* become *Disabled*. It is a period of continuous *Disability* which must be satisfied before *You* are eligible to receive benefits from *Us*. You must be continuously *Disabled* through *Your Elimination Period*." J.A. 38.

> 1) continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation*; and
> 2) not *Gainfully Employed*.

> After the [long-term disability ("LTD")] *Monthly Benefit* has been payable for 24 months, *Disability* means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:

> > 1) continuously unable to engage in any occupation for which *You* are or become qualified by education, training or experience; and
> > 2) not *Gainfully Employed*.

J.A. 38. Once approved for LTD, Shupe could be required under the Plan to provide "Continuing Proof of *Disability*." J.A. 47. Shupe applied and was approved for LTD on October 1, 2004. Benefits commenced on October 7, 2004.[4]

That same month, Shupe relocated from California to Virginia so that his family could assist with his care. Over the course of the next eleven years, Hartford continued to pay LTD benefits to Shupe, as he experienced no discernible improvement in his condition, despite the fact that he underwent spinal fusion surgeries in February 2005 and December 2006. Of particular relevance, following the surgeries, he continued to experience severe pain, which impacted his tolerance for sitting. Although his sitting-tolerance figure varied, it generally hovered around a thirty-minute maximum duration at any given time. *See* J.A. 926 (thirty minutes at a time for four to five hours per day in June 2007); 908 (one hour at a time for four hours per day in April 2011); 863 (thirty minutes to one hour at a time for three hours per day in May 2012); 664–65 (thirty minutes at a time for two-and-a-half hours

---

[4] Relatedly, Shupe qualified for Social Security disability benefits in 2008. Hartford reduced his LTD benefits by that amount, as permitted under the Plan.

per day in January 2013); 643 (thirty minutes at a time for three hours per day in March 2014); 639 (thirty minutes to one hour at a time for three to four hours per day in August 2015).

For pain management, Shupe's doctors prescribed various narcotics, including, among others, oxycontin and oxycodone, morphine and Percocet, and a fentanyl patch. Shupe experienced side effects as a result. For instance, in August 2007, when indicating "[t]o what extent do pain and/or side effects of medication affect attention and concentration," his doctor checked the box for "Severe (Precludes the attention and concentration required for even simple, unskilled work tasks)." J.A. 1342. In January 2013, when his doctor asked why it took him over an hour to complete intake forms and questionnaires, Shupe responded that "the meds he takes may cause him to be confused." J.A. 669. And in August 2015, his doctor noted that Shupe exhibited "some cognitive impairment from pain meds." J.A. 639. In addition to narcotics, Shupe's pain management regime also included steroid injections, which were ultimately discontinued when his insurance refused to cover them following implantation of a spinal cord stimulator.[5]

In February 2009, Hartford offered to settle Shupe's claim for a lump sum payment of $157,300. Shupe did not respond to the offer.

---

[5] "A spinal cord stimulator is an implanted device that sends low levels of electricity directly into the spinal cord to relieve pain." Eellan Sivanesan, M.D., *Spinal Cord Stimulator*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/treating-pain-with-spinal-cord-stimulators (last visited Nov. 17, 2021).

In 2013, Hartford requested that Shupe undergo a Functional Capacity Evaluation[6] in order to verify his continued disability under the Plan (the "2013 FCE"). The 2013 FCE concluded that

> Mr. Shupe at this period does not appear to have the capacity to tolerate an 8 hour work day / 40 hours per week for any physical demand level. . . . He is unable to sit greater than 30 minutes. Requires to lie down and rest for 5–10 min before he can return to sitting or standing after pain reaches to 7/10, then sitting and standing tolerance is reduced.

J.A. 664. In March 2014, Shupe's doctor noted that Shupe's restrictions were "perminent [sic]." J.A. 643.

Based on these and other consistent medical findings, Hartford's records indicated that Shupe was unable to return to work. *See* J.A. 175 (in December 2007, noting that "f/t work is unexpected"); 171 (in February 2009, indicating that "[r]ecovery to a level that would allow f/t work is unexpected"); 167 (in March 2009, explaining that "[p]ain would prevent work at even sedentary level"); 162 (in May 2011, stating that Shupe "continues to be precluded from fulltime gainful employment and therefore, remains totally disabled [from] any occupation"); 133 (in January 2013, noting that Shupe's examination "does not support ft work capacity"); 128 (in April 2014, indicating that "it is unreasonable to expect [Shupe] to return to f/t gainful employment"). Nonetheless, Hartford's Special Investigation Unit referred Shupe's file for surveillance on a few occasions. On one such occasion in July 2015, Shupe was observed driving to a medical facility, where he "opened

---

[6] An FCE "evaluates an individual's capacity to perform work activities related to his or her participation in employment." *Functional Capacity Evaluation*, Am. Occupational Therapy Ass'n, https://www.aota.org/about-occupational-therapy/professionals/wi/capacity-eval.aspx (last visited Nov. 17, 2021).

the trunk, lifted a wheelchair out of the trunk, bent at the waist, unfolded and secured the wheelchair, and pushed the wheelchair to the passenger side of the vehicle." J.A. 1371. He then "pushed [the occupied wheelchair] into the . . . facility." J.A. 1371. Nonetheless, the investigation was closed "as there were no[] material inconsistencies observed of the individual on surveillance and in the claimant's reported level of functionality." J.A. 1458.

Hartford did, however, subsequently contact Shupe's doctor for comment on his employability. On December 7, 2015, Dr. Beverly Whittenberg responded that she had recently taken over Shupe's care from his prior doctor (Dr. Damon Robinson), and she would need to review an updated FCE before answering Hartford's inquiry.

As a result, on February 4, 2016,[7] physical therapist Alyssa Wolf completed an FCE (the "Wolf FCE"), reporting for the first time over the course of Shupe's disability that he was capable of sitting for up to six hours per day and therefore could engage in full-time sedentary employment. Specifically, the Wolf FCE concluded that

> Mr. Shupe would be able to perform at a sedentary physical demand level job; however he had taken his prescribed narcotics[8] prior to the evaluation which effects [sic] the accuracy of VAS pain reporting. Mr. Shupe reported pain levels 3–7/10 during testing however without narcotics there is the potential that his pain level could be higher leading to inability to complete all tasks.

J.A. 534. On this point, the report noted that Shupe "elected to switch side[s] of weight bearing [while sitting during the evaluation], or to stand every five to ten minutes. The

---

[7] As recognized by the parties and the district court, the document erroneously listed the date as February 4, 2015.

[8] "Lipitor, Prevacid, Linzess, Ambien, Synthroid Fentanyl patch, Oxycodone, Xanax, Bupropion, Lexapro, Adderall, Tylenol (PRN), [and] laxative (PRN)." J.A. 537.

6

client should tolerate sitting on a constant basis at this time if permitted to stand/walk every 10 minutes to tolerance." J.A. 543. Accordingly, it concluded that Shupe "could tolerate sitting for up to 6 hours in an 8 hour work day with breaks to stand/walk." J.A. 535.

Hartford forwarded the Wolf FCE to Dr. Whittenberg, asking her to "[p]lease review the report and respond . . . with any comments . . . regarding the conclusions arrived at by the Independent Examiner." J.A. 520. On March 7, 2016, Dr. Whittenberg checked the box for "I agree with the FCE conclusions" without comment. J.A. 520.

Based on the Wolf FCE and Dr. Whittenberg's agreement, Hartford requested an Employability Analysis Report ("EAR") to gauge appropriate employment positions for Shupe. As completed by clinical research coordinator Lisa Housley, MS, the EAR (the "Housley EAR") identified Assignment Clerk, Jacket Preparer, and Batch-Records Clerk as a "representative sample of occupations," which Shupe could perform. J.A. 522–23.

By letter dated March 10, 2016 (the "termination letter"), approximately eleven years and five months after Shupe's LTD benefits commenced, Hartford concluded that he was no longer disabled within the Plan's meaning of the term beyond March 7, 2016. That is to say, relying largely on the Wolf FCE and Dr. Whittenberg's agreement to it, Hartford informed Shupe that he was capable of the full-time sedentary positions identified in the Housley EAR, and therefore LTD "benefits [were] not payable to [him] as of 03/08/2016." J.A. 245.

Shupe appealed the termination decision. As explained in the termination letter, ERISA accorded him "the right to appeal [Hartford's] decision and receive a full and fair review." J.A. 248; *see also* J.A. 56 (in the Plan, explaining "[y]ou, Your beneficiary (when

7

an appropriate claimant), or a duly authorized representative may appeal any denial of a claim for benefits by filing a written request for a full and fair review to the insurance company"). As part of the administrative appeal process, Shupe underwent a Vocational Evaluation by clinical research coordinator Tanja Hubacker, MA, NCC, LCPC (the "Hubacker VE"), an FCE by Daniel Lentscher and physical therapist Carlos Martinez (the "CAM FCE"), and an Independent Medical Evaluation by Dr. Emily Woolcock (the "Woolcock IME"). The Hubacker VE, completed on August 5, 2016, concluded that Shupe was incapable of full-time sedentary employment, explaining that during the assessment,

> Mr. Shupe alternated between sitting on my left side and my right side from a harder chair to a softer chair. He alternated between sitting, standing with his elbows leaning on the table so that his back was mostly tabletop flat, and standing leaning on the table with both hands. In addition to the frequency of position change being inconsistent with the ability to work, the standing positions leaning on elbows and hands reduce productivity beyond any employer tolerances.

J.A. 440. Further, the Hubacker VE explained that while its findings aligned with those in the Wolf FCE, it highlighted the disconnect between those findings and the Wolf FCE's conclusion:

> My observations are consistent with the FCE completed by Ms. Wolf documenting that Mr. Shupe "should tolerate sitting on a constant basis at this time if permitted to stand/walk every 10 minutes to tolerance." This limitation is not consistent with the ability to maintain work. Alternating positions between sitting and standing every 10 minutes is in excess of what is typically tolerated even in sedentary positions. If an individual is changing positions every 10 minutes, they are losing productivity beyond employer tolerances. The FCE indicates that that [sic] Mr. Shupe would need to stand or walk every 10 minutes. If Mr. Shupe needs to walk to relieve pain and is leaving the sedentary work station, he will not be able to maintain work.
>
> Ms. Wolf's report also notes, "without narcotics there is the potential that his pain level could be higher leading to inability to complete all tasks." Mr.

8

> Shupe reports side effects of narcotic pain medication to include fatigue and physical feelings of anxiety, difficulties with focus, concentration, and memory, and periods of brain fog. If the side effects of narcotic medication are such that it would impact his ability to maintain focus and concentration to the extent that there is a loss of productivity of 15–18% then this would further hinder Mr. Shupe from maintaining any work.

J.A. 440–41. On this last point, the Hubacker VE noted that Shupe was prescribed "narcotic pain medication including oxycodone and a [fentanyl] pain patch to help control the pain." J.A. 442.

> Similarly, the CAM FCE, completed on August 16, 2016, documented that Shupe

> did not demonstrate the functional capacities to return to work in his previous position or any other position at this time. . . . The findings indicate he is unable to sustain the tested capabilities . . . over an 8 hour day as he cannot sustain this level of effort for more than a short period of time[.]

J.A. 423. Specifically, it explained Shupe could sit for thirty-five minutes, but that duration consisted of positional changes, and he needed to stand and then lie down as a result of sitting.

> Finally, the Woolcock IME, completed on August 19, 2016, concluded that Shupe was disabled because he did "not demonstrate the functional capabilities to return to work in any position at this time." J.A. 439. And much like the Hubacker VE, the Woolcock IME registered its "disagree[ment] with . . . the [Wolf FCE's] analysis of Mr. Shupe's condition. . . . Mr. Shupe's condition was not assessed in its entirety. The [Wolf FCE] reviewer did not get a chance to comprehend the totality of Mr. Shupe's material and substantial deficiencies resulting from the osteomyelitis." J.A. 439.

9

Hartford subsequently requested that Dr. Jamie Lewis review Shupe's file and provide his medical opinion. On December 15, 2016, without consulting Dr. Whittenberg[9] or examining Shupe, and contrary to the Hubacker VE, the CAM FCE, and the Woolcock IME, Dr. Lewis reported

> [Shupe] would have the ability to sustain gainful employment with restrictions, in my opinion. Although the [Woolcock] IME suggests that he has no ability to work due to lumbar osteomyelitis and resulting sequela and although he has undergone multiple spinal procedures including a spinal cord stimulator, he only has mild weakness in the right lower extremities. Furthermore, the [CAM] FCE states that he demonstrates the ability to lift up to 27 pounds, but is limited with sitting, standing and walking. As such, the claimant would have the capacity to function at a sedentary to light physical level.

J.A. 399. To this end, Dr. Lewis provided, *inter alia*, the following restrictions:

> Sitting: 30 minutes continually up to 6 hours per day with the ability to alter standing and walking as needed[]
> Standing: 20 minutes at a time up to 4 hours per day
> Walking: 20 minutes at a time up to 4 hours per day

J.A. 399. Dr. Lewis also reasoned that "there are no physical or cognitive examination findings of any functional impairment suggesting that the claimant's ability to work has been directly impacted by adverse medication side effects."[10] J.A. 400.

On January 6, 2017, relying on Dr. Lewis' review, and representing to have considered the Hubacker VE, the CAM FCE, and the Woolcock IME, Hartford "determined that the termination of Mr. Shupe's claim must be upheld." J.A. 233.

---

[9] Dr. Lewis noted he was unable to reach Dr. Whittenberg for consultation.
[10] Housley completed a revised EAR based on Dr. Lewis' conclusion, identifying that Shupe was capable of the same positions she listed in the original EAR.

Following the denial of his administrative appeal, Shupe submitted additional documents to Hartford on June 30, 2017, including: a lumbar spine CT scan with contrast, dated May 8, 2017; a cervical spine CT scan with contrast, dated May 8, 2017; an EMG report, dated May 19, 2017; and a letter from Dr. Whittenberg, dated May 19, 2017. Of particular relevance, Dr. Whittenberg acknowledged her prior agreement with the Wolf FCE but explained further that

> I have received and reviewed [the CAM FCE], and the [Hubacker VE]. These two evaluations, which both found that Mr. Shupe is unable to work full time due to his symptoms and limitations, are generally consistent with my findings from my treatment of Mr. Shupe. Moreover, I note that the restrictions and limitations noted in the [CAM] FCE are generally consistent with those found by Ms. Wolfe, in the earlier FC[E].

> In conclusion, I am writing to express my agreement with the conclusions of both the [CAM] FCE . . . and the [Hubacker] VE . . . . In addition, I do not find that there has been any material medical improvement during the course of my treatment that would have allowed Mr. Shupe to return to work.

> Mr. Shupe will need lifelong, ongoing care to try to obtain some reasonable degree of comfort and baseline level of functioning. But I do not foresee him being able to maintain a full or part-time work position.

J.A. 1482–83. Dr. Whittenberg also explained that, contrary to Dr. Lewis' representation, she did return his call, but he was unavailable and in fact never returned her call.

On July 10, 2017, Hartford responded that it would not review these extra-record documents because Shupe had exhausted his administrative remedies.

On December 19, 2017, Shupe filed a complaint against Appellees in the U.S. District Court for the Southern District of California under 29 U.S.C. § 1132(a)(1)(B) of ERISA, seeking reinstatement to the Plan, payment of benefits, attorneys' fees and costs, and pre- and post-judgment interest. The court granted Hartford's motion to transfer venue

11

to the U.S. District Court for the Eastern District of Virginia. The parties subsequently stipulated to a de novo standard of review, which the district court approved.

The parties then filed cross-motions for summary judgment. Appellees also moved to strike the extra-record documents Shupe sent to Hartford after it denied his appeal, which Shupe filed with his motion for summary judgment. After conducting a hearing, the district court denied Shupe's motion for summary judgment and granted Appellees' motion to strike and motion for summary judgment. On the motion to strike, the court explained, "As Dr. Whittenberg's May 2017 letter . . . does not repudiate her agreement with the [Wolf] FCE results, the Court finds this Declaration and its exhibits are not new evidence, nor are they new medical opinions required to resolve this matter." *Shupe v. Hartford Life & Accident Ins. Co.*, No. 1:18-cv-860, 2019 WL 3268826, at *3 (E.D. Va. July 19, 2019). As for Appellees' motion for summary judgment, the court noted, "The EAR reported three alternative occupations that [Shupe] can physically perform, is qualified for, and pay greater than 60% of his prior salary. Thus, [he] . . . did not meet the Plan's definition of 'disabled.'" *Id.* at *4.

Shupe timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

II.

We begin with a preliminary issue, as Shupe asserts that the district court erred by granting Appellees' motion to strike the extra-record evidence, namely Dr. Whittenberg's letter. We find this argument unpersuasive.

12

In *Quesinberry v. Life Insurance Co. of North America*, we held "that courts conducting de novo review of ERISA benefits claims should review only the evidentiary record that was presented to the plan administrator or trustee except where the district court finds that additional evidence is necessary for resolution of the benefit claim," i.e., in "[e]xceptional circumstances." 987 F.2d 1017, 1026–27 (4th Cir. 1993). And when assessing a claim for inclusion, courts should consider "why the evidence proffered was not submitted to the plan administrator." *Id.* at 1027. Our review is for abuse of discretion. *Id.*

At bottom, we are persuaded that exclusion of Dr. Whittenberg's letter was proper because Shupe cannot demonstrate a persuasive reason why he failed to present the letter during the administrative appeal. Specifically, Dr. Whittenberg's letter contains two material points, both of which could have been presented during the administrative appeal.

Even assuming Shupe met one of the *Quesinberry* factors or another prerequisite,[11] he could have approached Dr. Whittenberg for clarification on her agreement with the Wolf FCE at any time during the administrative appeal process. Hartford's termination letter,

---

[11] *Quesinberry* detailed a nonexhaustive list of circumstances where inclusion may be appropriate, including

> claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process.

987 F.2d at 1027.

dated March 10, 2016, informed Shupe that "[a] copy of the [Wolf] FCE was sent to Dr. Whittendberg [sic] for review and comment. In a response dated 03/07/2016, Dr. Whittendberg [sic] advised she was in agreement with the [Wolf] FCE results." J.A. 248. The letter also discussed the Wolf FCE and the Housley EAR, concluding that "[b]ased on this information, we have concluded that you are not prevented from performing the essential duties of any occupation." J.A. 248. Upon receipt of the termination letter, Shupe was on notice that Hartford relied, at least in part, on Dr. Whittenberg's agreement with the Wolf FCE when terminating his benefits. If he had questions for Dr. Whittenberg based on the termination letter, he could have sought clarification from her at that time, so that any resulting information could have been submitted during his subsequent administrative appeal. He failed to do so.

Shupe also could have obtained documentation of Dr. Whittenberg's agreement with the Hubacker VE (completed on August 5, 2016) and the CAM FCE (completed on August 16, 2016) during the administrative appeal process, as both evaluations were conducted in preparation for Hartford's review of the appeal. But he did not do so, and his attempt to expand the record at this point is not convincing. *Moore v. Unum Provident Corp.*, 116 F. App'x 416, 420 (4th Cir. 2004) (per curiam) (affirming exclusion of evidence under *Quesinberry* where "Unum could have submitted the toxicology report to Dr. Sexton, or another expert, for an opinion before the administrative record closed. For whatever reason, Unum failed to take this step.").

We therefore conclude that the district court did not abuse its discretion when granting Appellees' motion to strike. Accordingly, we affirm that ruling.

14

III.

Next, Shupe asserts that he is entitled to reinstatement to the Plan and payment of disability benefits because the record demonstrates he was disabled under the Plan's terms when Hartford terminated his benefits. In other words, he contends he was "continuously unable to engage in any occupation for which [he was] or [was able to] become qualified by education, training or experience." J.A. 38. We agree. Accordingly, we reverse the district court's grant of summary judgment.

A.

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011). Under Rule 56, a court may award summary judgment to the moving party only if it shows that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In doing so, we "view the facts and all justifiable inferences arising therefrom in the light most favorable to . . . the nonmoving party." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 565 n.1 (4th Cir. 2015) (internal quotation marks omitted).

The Supreme Court has held that "a denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the

15

plan gives the administrator or fiduciary discretionary authority to make eligibility determinations, the review is for abuse of discretion. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).

Here, the parties stipulated—and the district court agreed—"that any language in the Policy granting Hartford discretionary authority is void under Illinois law, and that the appropriate judicial standard of review in this case should be de novo." J.A. 25. This conclusion was correct because Illinois, the state in which Hartford's policy covering the Plan was "issued and delivered," prohibits discretionary clauses in health and disability insurance policies. J.A. 24; *see also* 50 Ill. Admin. Code § 2001.3. Accordingly, on de novo review, "our job is to make our own independent determination of whether [Shupe] was entitled to the [LTD] benefits. The correctness, not the reasonableness, of [Hartford's] denial of [LTD] benefits is our only concern in this appeal." *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 819 (4th Cir. 2013).

B.

Upon conducting a de novo review of the record, we conclude that Shupe was incapable of full-time employment (sedentary or otherwise) when Hartford terminated his benefits. That is to say, he was disabled at that time within the Plan's meaning of the term, as he was "continuously unable to engage in any occupation for which [he was] or [was able to] become qualified by education, training or experience."[12] J.A. 38.

---

[12] Shupe's capacity for part-time employment is not at issue.

In arriving at this conclusion, we "look at the evidence that was before the plan administrator or trustee at the time of the determination." *Quesinberry*, 987 F.2d at 1025. "The burden of proving the disability is on the employee," *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 603 (4th Cir. 1999), and he must do so via "objectively satisfactory proof, *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 270 (4th Cir. 2002). We note that, in addition to the evidence from the initial termination decision (such as Shupe's pre-Wolf FCE medical history, the Wolf FCE, the Housley EAR, and Dr. Whittenberg's agreement with the Wolf FCE), our analysis also includes the medical evaluations conducted post-termination (the Hubacker VE, the CAM FCE, the Woolcock IME, and Dr. Lewis' report), as the Plan in conjunction with Hartford's policies expressly provided for comprehensive consideration of such documents.[13]

We begin our de novo review with Shupe's medical evidence predating the Wolf FCE to understand Shupe's baseline level of function at that time. On March 10, 2014,

---

[13] *See* J.A. 56 (in the Policy, explaining that "[i]n connection with [an administrative appeal] request, documents pertinent to the administration of the Plan may be reviewed, and comments and issues outlining the basis of the appeal may be submitted in writing"); 249 (in the termination letter, explaining "[a]long with your appeal letter, you may submit written comments, documents, records and other information related to your claim"); *see also* J.A. 249 (in the termination letter, explaining that "[o]nce [it] receive[d] your appeal, [Hartford] w[ould] again review your entire claim, including any information previously submitted and any additional information received with your appeal."); 233 (in the letter upholding the termination decision, explaining, "This [administrative appeal] review [was] conducted separately from the individuals who made the original decision *without deference to that decision*. Upon completion of a *comprehensive review* of the information in Mr. Shupe's claim file *viewed as a whole*, [Hartford has] determined that the termination of Mr. Shupe's claim must be upheld. . . . [It] based [its] decision to uphold the termination of your claim for benefits upon Policy language and *all documents contained in your claim file, viewed as a whole*." (emphasis added)).

17

Shupe's doctor documented that Shupe could sit for thirty minutes at a time for up to three hours per day, noting that this restriction, among others, was "perminent [sic]." J.A. 643. In turn, Hartford's records indicated on April 16, 2014, that "it [was] unreasonable to expect [Shupe] to return to f/t gainful employment." J.A. 128.

Similarly, on August 26, 2015, Shupe's doctor recorded that Shupe could sit for thirty minutes to one hour at a time for up to three or four hours per day and that he suffered from "some cognitive impairment from pain meds." J.A. 639. Shupe self-reported similar facts in his sworn claimant questionnaire from August 26, 2015, stating that his "condition(s) [were] pretty much the same as 18 months ago with some getting worse and also some new problems in [his] cervical spine causing problems with [his] hands and fingers." J.A. 628. More specifically, he explained, that

> [a]fter [he] begin[s] [an] activity such as standing, walking, bending and even sitting for periods the pain will get increasingly worse . . . . [He] must then sit or lay down to get any relief from those symptoms. . . . [He] may be able to make lunch, then lay down for 20 mins. [T]hen vacuum for 15 mins. Then lay down against for 15 mins. [A]nd then maybe do some laundry before having to lay down for a couple hours to reduce the pain.

J.A. 628. In short, Shupe's consistent medical history leading up to the Wolf FCE reflects his inability to maintain full-time sedentary employment.

In contrast, the Wolf FCE set in motion Hartford's decision to terminate Shupe's benefits. At face value, this report would appear to support Hartford's decision. However, a deeper reading reflects that the Wolf FCE is internally inconsistent and represents an outlier in Shupe's medical history. Despite its findings aligning with the bulk of Shupe's prior evaluations in demonstrating his limitations and disability, the Wolf FCE was the first

18

to conclude that he was capable of sitting for six hours in an eight-hour workday and therefore employable in a full-time sedentary position. Given the *non sequitur* nature of its conclusion, we find the Wolf FCE to be of limited value in our analysis.

Conducted on February 4, 2016, the Wolf FCE found that Shupe must be "permitted to stand/walk every 10 minutes to tolerance" in order to sit for longer periods of time. J.A. 543. On this point, the report noted that Shupe "elected to switch side[s] of weight bearing [while sitting during the evaluation], or to stand every five to ten minutes," J.A. 543, and self-reported his average sitting tolerance as thirty minutes to one hour. These findings are unremarkable, as they generally track Shupe's medical history, as discussed above. However, the Wolf FCE's unique divergence from the consistently restrictive findings of Shupe's medical history is stark when it concludes that he "could tolerate sitting for up to 6 hours in an 8 hour work day with breaks to stand/walk. Standing/walking would only be tolerated as rest breaks from sitting," J.A. 535, meaning he "would be able to perform at a sedentary physical demand level job," J.A. 534. This conclusion is not supported by Shupe's contemporaneous medical history, which uniformly documented the debilitating nature of his condition. As detailed above, Shupe's preexisting medical evaluations established his inability to function in an employment setting. In addition, all but one of the post-termination evaluations bolster this conclusion.

The Hubacker VE, completed on August 5, 2016, found that Shupe "alternated positions every 6–10 minutes." J.A. 440. It also explained that Shupe experienced "side effects of narcotic pain medication to include fatigue and physical feelings of anxiety, difficulties with focus, concentration, and memory, and periods of brain fog." J.A. 440–41.

19

The report noted that Shupe was prescribed "narcotic pain medication including oxycodone and a [fentanyl] pain patch to help control the pain." J.A. 442.

In line with these findings, the Hubacker VE determined,

> [I]t is my opinion that [Shupe] cannot return to any work. The frequency in which he needs to alternate sitting and standing/walking does not allow for productivity at employer tolerance levels. . . . [T]he positions in which he searches for comfort include leaning on his arms and leaning on his hands over the work station. . . . The position does not allow for work. After periods of activity . . . Mr. Shupe needs to lie down. This would not be permitted at the work place. . . . [Shupe] has up to two good days a week. If an employee is missing 2 or more days of work a month, they will not be able to maintain competitive employment.

J.A. 443. The Hubacker VE also indicated that its observations were consistent with the Wolf FCE's findings, but emphasized the clear disconnect between the Wolf FCE's findings and conclusion:

> My observations are consistent with the FCE completed by Ms. Wolf documenting that Mr. Shupe "should tolerate sitting on a constant basis at this time if permitted to stand/walk every 10 minutes to tolerance." This limitation is not consistent with the ability to maintain work. Alternating positions between sitting and standing every 10 minutes is in excess of what is typically tolerated even in sedentary positions. If an individual is changing positions every 10 minutes, they are losing productivity beyond employer tolerances. The FCE indicates that that [sic] Mr. Shupe would need to stand or walk every 10 minutes. If Mr. Shupe needs to walk to relieve pain and is leaving the sedentary work station, he will not be able to maintain work.

J.A. 440.

The CAM FCE, completed on August 16, 2016, arrived at the same conclusion. It found that Shupe could sit for thirty-five minutes "occasional[ly]," but required "[p]ositional changes. Needed to stand. Needed to lie down." J.A. 432. It also determined that Shupe could stand for thirty minutes "occasional[ly]." J.A. 432. Accordingly, the CAM

FCE reported that Shupe "tested into the MEDIUM (Unsustainable) physical demand category which is not considered sustainable over an 8 hour day." J.A. 430. Specifically, the CAM FCE documented that Shupe

> did not demonstrate the functional capacities to return to work in his previous position or any other position at this time. . . . The findings indicate he is unable to sustain the tested capabilities . . . over an 8 hour day as he cannot sustain this level of effort for more than a short period of time[.]

J.A. 423.

Finally, the Woolcock IME, completed on August 19, 2016, determined that Shupe suffered from "Chronic lumber osteomyelitis, Lumbar radiculitis, Degenerative disc disease, Galt derangement, Left Rotator cuff tear, Post laminectomy syndrome, Hypothyroidism, Depression, Hypercholesterolemia, Chronic pain syndrome, S/P multiple spinal surgeries, [and] Side effects of pain medication." J.A. 438. In line with these conditions, the Woolcock IME reported that "Mr. Shupe is disabled as defined by the Hartford. . . . The recent [CAM] FCE performed on 8/16/16 affirms my opinion that Mr. Shupe does not demonstrate the functional capabilities to return to work in any position at this time." J.A. 439. And, much like the Hubacker VE, the Woolcock IME registered its "disagree[ment] with . . . the [Wolf FCE's] analysis of Mr. Shupe's condition. . . . Mr. Shupe's condition was not assessed in its entirety. The [Wolf FCE] reviewer did not get a chance to comprehend the totality of Mr. Shupe's material and substantial deficiencies resulting from the osteomyelitis." J.A. 439. These post-termination evaluations, coupled with Shupe's contemporaneous medical history predating the Wolf FCE, all uniformly

21

conclude that Shupe was incapable of full-time sedentary employment and lead us to conclude that the Wolf FCE is an unsupported outlier.

Also apparent from our review is that the Wolf FCE suffers from practical and logistical inconsistencies. For instance, as Shupe highlights, "[i]t is difficult to reconcile [the Wolf FCE's conclusion] with [its] 10-minute limitation. Assuming that Shupe took only a 5-minute break every ten minutes, he would need a 9-hour workday to accomplish enough 10-minute sitting periods to achieve 6 hours of sitting." Opening Br. 19 n.10. Moreover, the Wolf FCE's conclusion that Shupe was capable of full-time sedentary employment is contradicted by the fact that Shupe must frequently alternate between sitting, standing, walking, and *lying down*. J.A. 628 (Shupe's claimant questionnaire from August 26, 2015, stating that he must "sit or lay down to get any relief from [his] symptoms"); 432 (the CAM FCE, explaining that Shupe "[n]eeded to stand [and] [n]eeded to lie down [as a result of sitting]"). These activities make it impractical, if not illogical, that Shupe could perform any full-time employment. As a consequence, Shupe's around-the-clock rotations between sitting, standing, walking, and lying down would make it nearly impossible to sustain any acceptable level of productivity to maintain employment. The bottom line on this point is that "prolonged sitting—the very thing required in most sedentary jobs—aggravated [Shupe's] symptoms." *Myers v. Hercules, Inc.*, 253 F.3d 761, 766–67 (4th Cir. 2001).

Further, Shupe's prescribed medications operate as an inhibitor to full-time sedentary employment. At the time of the Wolf FCE, Shupe was prescribed "Lipitor, Prevacid, Linzess, Ambien, Synthroid Fentanyl patch, Oxycodone, Xanax, Bupropion,

22

Lexapro, Adderall, Tylenol (PRN), [and] laxative (PRN)." J.A. 537. The Wolf FCE itself recognizes the disconnect on this point because, while asserting that Shupe would be capable of a full-time sedentary position, it highlights the caveat that its findings may be skewed because of Shupe's prescribed narcotics:

> Mr. Shupe would be able to perform at a sedentary physical demand level job; *however he had taken his prescribed narcotics prior to the evaluation which effects [sic] the accuracy of VAS pain reporting. Mr. Shupe reported pain levels 3–7/10 during testing however without narcotics there is the potential that his pain level could be higher leading to inability to complete all tasks.*

J.A. 534 (emphasis added).

In sum, it is unclear how the Wolf FCE arrived at the conclusion that Shupe was capable of full-time sedentary employment given his medical history, the report's attendant findings on his tolerance for sitting, and the effects of his prescription narcotics. Indeed, we do not understand how Shupe could complete a full workday—let alone a full workweek—when he must stand, walk, and/or lie down as a break from sitting about every ten minutes and requires heavy levels of narcotics to manage his pain. Accordingly, the Wolf FCE's conclusion is practically irreconcilable with the record, meaning it provides limited assistance in our disability analysis on de novo review. *See White v. Eaton Corp. Short Term Disability Plan*, 308 F. App'x 713, 717 (4th Cir. 2009) (per curiam) (concluding that a plan abused its discretion when relying on an FCE in the benefits termination process, where "[t]he FCE's conclusion that [the claimant] was capable of meeting the job description of a machinist d[id] not comport with its actual observations of [the claimant's] physical abilities"); *Smith v. Metropolitan Life Ins. Co.*, 274 F. App'x

251, 257 (4th Cir. 2008) (per curiam) (remarking on a doctor's report that the claimant could work, explaining that it was "difficult to believe" that conclusion when it did not follow from the report's findings and was belied by "objective medical evidence").

The shortcomings of the Wolf FCE undercut Hartford's subsequent medical evidence based on that report: the Housley EAR and Dr. Whittenberg's agreement with the Wolf FCE. Indeed, Hartford would not have requested completion of an EAR to gauge appropriate employment for Shupe had the Wolf FCE arrived at the conclusion that its findings dictated: Shupe was unable to work. As for Dr. Whittenberg's assent to the Wolf FCE, we accord it little weight considering Dr. Whittenberg had only recently assumed Shupe's care at the time she notated that agreement. Specifically, Dr. Whittenberg oversaw Shupe's care beginning in August 2015 and responded to the Wolf FCE in March 2016, but the record does not reflect that Shupe attended any in-person appointments with her during that timeframe. Under the circumstances of this new doctor-patient relationship, rather than analyze Dr. Whittenberg's agreement with the Wolf FCE in a vacuum, we deem it appropriate to consider the contemporaneous comments of Shupe's prior doctor, which confirm that Dr. Whittenberg's assent was not of significant evidentiary value.

Dr. Robinson oversaw Shupe's care from February 2009 to August 2015. In his final evaluation of Shupe on August 26, 2015, as mentioned above, Dr. Robinson reported that Shupe could sit for thirty minutes to one hour at any given time but only for three to four hours per day and that he suffered from "some cognitive impairment from pain meds." J.A. 639. Dr. Robinson did not directly address Shupe's employability, but his findings comport with an inability to function in a full-time sedentary position. And, as noted above, Shupe's

24

prior medical evaluations were clear that he was not capable of full-time employment in any capacity.

In view of the incompatibility of the Wolf FCE's conclusion with its own findings and the clarity of Shupe's long and consistent medical history, Dr. Lewis' report effectively stands alone as the only post-termination assessment recommending that Shupe was capable of full-time sedentary employment. In contrast with the uniform conclusions of the Hubacker VE, the CAM FCE, and the Woolcock IME, Dr. Lewis' report, dated December 15, 2016, determined that Shupe was capable of full-time sedentary employment, noting that "[a]lthough [Shupe] does continue to have self reported limitations and pain with mild ongoing neurological deficits and reduced motion, he would have the ability to function with restrictions." J.A. 400. Specifically, Dr. Lewis found that Shupe was "limited with sitting, standing and walking." J.A. 399. Accordingly, he listed the following restrictions:

> Sitting: 30 minutes continually up to 6 hours per day with the ability to alter standing and walking as needed[]
> Standing: 20 minutes at a time up to 4 hours per day
> Walking: 20 minutes at a time up to 4 hours per day

J.A. 399. Dr. Lewis explained, "Prognosis for returning to work without restrictions is poor. These restrictions are likely ongoing and indefinite." J.A. 400.

Nonetheless, he concluded that "the claimant would have the capability to function at a sedentary to light physical level . . . on a full-time basis, 8 hours per day in 40 hours per week with restrictions[.]" J.A. 399. On side effects, he reasoned, "[T]here are no physical or cognitive examination findings of any functional impairment suggesting that the claimant's ability to work has been directly impacted by adverse medication side

25

effects." J.A. 400. Dr. Lewis neither consulted with Dr. Whittenberg (or any other of Shupe's healthcare practitioners) on Shupe's conditions nor examined Shupe in the process.

We conclude that Dr. Lewis' assessment is of limited efficacy and cannot stand against the weight of Shupe's medical history and contemporaneous evaluations concluding to the contrary, particularly considering Dr. Lewis completed his report without examining Shupe or consulting with Dr. Whittenberg. *See White v. Sun Life Assur. Co. of Canada*, 488 F.3d 240, 255 (4th Cir. 2007) ("While [the physician-consultant's] . . . letters expressed skepticism about [the claimant's] disability, his conclusions lack support in [the claimant's] medical records."), *abrogated on other grounds by Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99 (2013); *Smith*, 274 F. App'x at 257 (discounting report of physician "who neither examined [the claimant] nor spoke to him or to any of his treating physicians" and concluded—contrary to the "objective medical evidence" and "without explanation"—that the claimant could work). Indeed, Dr. Lewis provided scant explanation, if any, to support his decision to discount the substantial evidence contrary to his ultimate conclusion. *See White*, 488 F.3d at 256 (discounting vocational consultant's report because it "offered no reason why the constant pain and inability to sit described by [the claimant's] various examining physicians did not fully support [the] conclusion that [the claimant] was unable to work"), *abrogated on other grounds by Heimeshoff*, 571 U.S. 99. Accordingly, much like the Wolf FCE, Dr. Lewis' report provides limited assistance in our disability analysis on de novo review.

Having completed a de novo review of the record, we arrive at the conclusion supported by the bulk of Shupe's medical history and evaluations completed contemporaneous to Hartford's termination decision: Shupe was incapable of employment in a full-time sedentary position. In other words, Shupe was disabled within the Plan's meaning of the term because he was "continuously unable to engage in any occupation for which [he was] or [was able to] become qualified by education, training or experience." J.A. 38.

Accordingly, we reverse the district court's grant of summary judgment and remand with instructions to enter judgment in Shupe's favor. Additionally, we direct the district court to order Shupe's reinstatement to the Plan for receipt of benefits from the date of termination. We leave Shupe's attendant request for attorneys' fees and costs, as well as pre- and post-judgment interest, to the district court for consideration in the first instance.

## IV.

For the reasons discussed above, the judgment of the district court is

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED WITH INSTRUCTIONS.*

27